# In the United States Court of Appeals for the Sixth Circuit

Christian Robbins, *et al.*,
*Plaintiffs-Appellants*,

v.

Tennessee Housing Development Agency, *et al.*,
*Defendants-Appellees*.

On Appeal from the United States District Court
for the Western District of Tennessee, No. 1:24-cv-01229

## APPELLANTS' BRIEF

William T. Thompson
LEHOTSKY KELLER COHN LLP
7500 Rialto Blvd., Suite 1-250
Austin, TX 78735
(512) 693-8350

Jared B. Magnuson
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350

Jonathan F. Cohn
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
(512) 693-8350
jon@lkcfirm.com

Mark M. Rothrock
LEHOTSKY KELLER COHN LLP
8513 Caldbeck Drive
Raleigh, NC 27615
(512) 693-8350

*Counsel for Plaintiffs-Appellants*

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellants make the following disclosure under Sixth Circuit Rule 26.1:

**1. Are Appellants a subsidiary or affiliate of a publicly owned corporation?**

No.

**2. Is there a publicly owned corporation, not a party to the appeal or an amicus, that has a financial interest in the outcome?**

None known.

*/s/ Jonathan F. Cohn*
Jonathan F. Cohn
*Counsel of Record for Plaintiffs-Appellants*

Circuit Rule 26.1 Disclosure Statement..................................................................i

Table of Contents ...................................................................................................ii

Table of Authorities ...............................................................................................iv

Statement in Support of Oral Argument ...............................................................i

Introduction ............................................................................................................1

Statement in Support of Jurisdiction.....................................................................4

Statement of Issues.................................................................................................4

Statement of the Case ............................................................................................5

       A.  Factual Background...................................................................5

          1.  Congress enacts the American Rescue Plan Act and the Homeowner Assistance Fund to help American homeowners during the COVID-19 pandemic. ......................5

          2.  THDA chooses to administer Tennessee's Homeowner Assistance Fund program on the basis of race.........................6

       B.  Procedural History. ...................................................................8

Summary of the Argument....................................................................................10

Standard of Review ...............................................................................................11

Argument ...............................................................................................................11

    I.  Congress Abrogated THDA's Sovereign Immunity From Title VI Claims. ......................................................................................11

    II.  THDA Waived Any Sovereign Immunity From Title VI Claims by Accepting HAF Funds. .......................................................19

    III.  THDA is Not an Arm of the State Entitled to Sovereign Immunity. ....................................................................................21

    IV.  *Ex parte Young* Independently Authorizes Appellants' Claims for Prospective Injunctive Relief.............................................25

Conclusion..............................................................................................................28

Certificate of Compliance .....................................................................................30

Certificate of Service ........................................................................................31

Designation of District Court Record.............................................................32

**Page(s)**

**Cases**

*Alexander v. Sandoval,*
532 U.S. 275 (2001) ........................................................ 1, 2, 10, 12, 15, 16, 19

*Atascadero State Hosp. v. Scanlon,*
473 U.S. 234 (1985) ........................................................................ 13, 14, 15

*Bd. of Trustees of Univ. of Ala. v. Garrett,*
531 U.S. 356 (2001) .................................................................................. 13

*Bryant v. New Jersey Dep't of Transp.,*
1 F. Supp. 2d 426 (D.N.J. 1998) ............................................................. 12

*Carten v. Kent State Univ.,*
282 F.3d 391 (6th Cir. 2002) ................................................................... 20

*Cherry v. Univ. of Wis. Sys. Bd. of Regents,*
265 F.3d 541 (7th Cir. 2001) ................................................................... 20

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,*
527 U.S. 666 (1999) .................................................................................. 19

*Dellmuth v. Muth,*
491 U.S. 223 (1989) .................................................................................. 18

*Doe v. DeWine,*
910 F.3d 842 (6th Cir. 2018) ................................................................... 25

*Doe v. Nebraska,*
345 F.3d 593 (8th Cir. 2003) ................................................................... 19

*Ex parte Young,*
209 U.S. 123 (1908) .................................................................................... 3

*Galette v. N.J. Transit Corp.,*
146 S. Ct. 854 (2026)......................................................3, 10, 21, 22, 23, 24

*Gean v. Hattaway,*
330 F.3d 758 (6th Cir. 2003)...................................................................19

*Gomez-Perez v. Potter,*
553 U.S. 474 (2008)...................................................................................17

*Hans v. Louisiana,*
134 U.S. 1 (1890)........................................................................................13

*In re Davis,*
960 F.3d 346 (6th Cir. 2020).................................................................17

*Kanuszewski v. Mich. Dep't of Health & Hum. Servs.,*
927 F.3d 396 (6th Cir. 2019).................................................................13

*Lac du Flambeau Band of Lake Superior Chippewa Indians v.*
*Coughlin,*
599 U.S. 382 (2023)..................................................................................16

*Lane v. Pena,*
518 U.S. 187 (1996)...................................................................................14

*Lesage v. State of Texas,*
158 F.3d 213 (5th Cir. 1998)............................................................12, 13

*Litman v. George Mason Univ.,*
186 F.3d 544 (4th Cir. 1999)..................................................................20

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024)..................................................................................12

*Milliken v. Bradley,*
433 U.S. 267 (1977)............................................................................11, 28

*Morgan v. Bd. of Prof. Resp. of the Sup. Ct. of Tenn.,*
63 F.4th 510 (6th Cir. 2023)......................................................25

*Muniz-Muniz v. U.S. Border Patrol,*
741 F.3d 668 (6th Cir. 2013).....................................................11

*New Prime Inc. v. Oliveira,*
586 U.S. 105 (2019)..................................................................12

*Nihiser v. Ohio E.P.A.,*
269 F.3d 626 (6th Cir. 2001)...............................10, 13, 14, 19

*Sossamon v. Texas,*
563 U.S. 277 (2011)..................................................................19

*Town of Smyrna v. Municipal Gas Auth. of Ga.,*
723 F.3d 640 (6th Cir. 2013).....................................................22

*WCI, Inc. v. Ohio Dep't of Pub. Safety,*
18 F.4th 509 (6th Cir. 2021)..............................................13, 16

*Welch v. Tex. Dep't of Highways & Pub. Transp.,*
483 U.S. 468 (1987)..................................................................14

*Will v. Mich. Dep't of State Police,*
491 U.S. 58 (1989)....................................................................16

*Wis. Cent. Ltd. v. United States,*
585 U.S. 274 (2018)..................................................................12

**Statutes**

11 U.S.C. § 106.............................................................................17

15 U.S.C. § 9058d ..........................................................................5

28 U.S.C. § 1291.............................................................................4

28 U.S.C. § 1331.............................................................................4

42 U.S.C. § 2000d-7 ..................................................................11, 18

Pub. L. No. 99-506, § 1003, 100 Stat. 1807 (Oct. 21, 1986) ..........................12, 15

Tenn. Code Ann. § 13-23-104 .................................................................23

Tenn. Code Ann. § 13-23-106 .................................................................23

Tenn. Code Ann. § 13-23-107 .................................................................23

Tenn. Code Ann. § 13-23-115 .................................................................23

Tenn. Code Ann. § 13-23-120 .................................................................24

Tenn. Code Ann. § 13-23-122 .............................................................24, 25

Tenn. Code Ann. § 13-23-124 .................................................................24

Tenn. Code Ann. §§ 13-23-101, *et seq*. ..................................................23

## Other Authorities

Tenn. Op. Att'y Gen. No. 81-173, 1981 WL 142981 (Mar. 18, 1981) .......................................................................................24

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellants believe that oral argument would aid the Court in deciding the sovereign immunity issues raised in this appeal.

## INTRODUCTION

When COVID-19 swept through the Nation, it did not discriminate. It shuttered restaurants, bankrupted businesses, and cut factory hours without regard to race. Congress responded to this crisis by, among other things, creating the Homeowner Assistance Fund, appropriating billions of dollars for States to distribute to struggling homeowners unable to pay their mortgages.

In implementing the federal-assistance program, however, the Tennessee Housing Development Agency ("THDA") adopted explicit racial preferences in violation of Title VI and the Equal Protection Clause. The agency targeted outreach to its preferred minorities and expressly discriminated against white and Jewish homeowners who applied for assistance. Appellants are five white Tennessee homeowners who are victims of THDA's racial discrimination.

According to the district court, they have no remedy. Decades ago, the Supreme Court held that Congress "expressly abrogated States' sovereign immunity" in Title VI suits. *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) (citing 42 U.S.C. § 2000d-7)**.** But, "despite *Alexander*'s holding that § 2000d-7 abrogates sovereign immunity," the district court ruled that THDA has "sovereign immunity" and thus can discriminate against its own citizens with impunity. Op. and Ord. Granting Defs.' Mot. to Dismiss ("Op."), R.62, PageID 710. The University of Tennessee can engage in race-based affirmative action, and THDA can distribute federal funds on the basis of race.

In the district court's view, "sovereign immunity is distinct from Eleventh Amendment immunity," and, "despite" *Alexander*, Congress abrogated only Eleventh Amendment immunity, allowing states to continue to discriminate on the basis of race. *Id.* Were this true, virtually every Title VI case against a state in the last 40 years was wrongly decided. No court has ever adopted this curious position, which would set back the Civil Rights movement by decades. This Court should reverse for four independent reasons.

*First*, as the Supreme Court has held, Congress unambiguously abrogated sovereign immunity for Title VI claims. Section 2000d-7 provides that States accepting federal funds "shall not be immune under the Eleventh Amendment"—language the Supreme Court held "expressly abrogated States' sovereign immunity." *Alexander*, 532 U.S. at 280. Every circuit that has addressed the question agrees: Congress abrogated sovereign immunity, regardless of whether the plaintiff is suing his own state or another state that discriminated against him. The district court acknowledged *Alexander* and dismissed this case "despite" it, solely based on dictum in a nude dancing case that had nothing to do with Title VI, racial discrimination, or the statute abrogating sovereign immunity.

*Second*, THDA waived any immunity it might otherwise have had. As a condition of receiving $168 million in HAF funds, THDA signed assurances that it would comply with Title VI, including its prohibition on racial discrimination and the express elimination of immunity. THDA cannot accept

federal funds, promise to comply with Title VI, and then invoke immunity when it violates federal civil-rights laws.

*Third*, even if Tennessee had sovereign immunity, THDA does not. Sovereign immunity is personal to the State and does not extend to independent entities that are not arms of the State. *See Galette v. N.J. Transit Corp.*, 146 S. Ct. 854, 865 (2026). Under *Galette*, THDA is not an arm of the State because the Tennessee legislature created it as an independent corporate entity, and Tennessee law expressly disclaims State liability for its obligations.

*Fourth*, at the very least, Appellants' claims are subject to the *Ex parte Young* exception from sovereign immunity. 209 U.S. 123, 156-57 (1908). Appellants seek prospective relief against officers sued in their official capacity for THDA's ongoing discriminatory conduct. THDA's individual officers continue to administer the program and process applications in a discriminatory manner, and a prospective injunction halting that ongoing conduct falls squarely within the doctrine's scope.

This Court should reverse and remand for proceedings on the merits.

## STATEMENT IN SUPPORT OF JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 1291 because this is an appeal from a final decision of the district court. *See* Op., R.62. The district court exercised jurisdiction under 28 U.S.C. § 1331 and issued a final judgment on March 16, 2026. Appellants timely appealed on March 16, 2026.

## STATEMENT OF ISSUES

1.  Whether § 2000d-7 expressly abrogates a State's sovereign immunity, as the Supreme Court held in *Alexander*?

2.  Whether Tennessee waived sovereign immunity from this Title VI suit when it accepted federal funds pursuant to express assurances that it would comply with Title VI?

3.  Whether THDA is entitled to sovereign immunity even though it is not an arm of the state under *Galette v. New Jersey Transit Corporation*, 146 S. Ct. 854 (2026)?

4.  Whether *Ex parte Young* permits Appellants to seek a prospective injunction against state officials who continue to administer a federal housing program on the basis of race?

STATEMENT OF THE CASE

## A. Factual Background.

### 1. Congress enacts the American Rescue Plan Act and the Homeowner Assistance Fund to help American homeowners during the COVID-19 pandemic.

In 2021, Congress enacted the American Rescue Plan Act (the "Act"), which established the Homeowner Assistance Fund ("HAF") to assist home-owners struggling to pay their mortgages in the wake of the COVID-19 pandemic. *See* 15 U.S.C. § 9058d; First Am. Compl. ("FAC"), R.35, PageID 311, ¶¶ 39-40. Under the Act, the U.S. Department of the Treasury oversees the allocation of federal funds to States, and States then implement and ad-minister their own programs. FAC, R.35, PageID 311, ¶ 42. The Act requires that at least 60% of HAF funds be used to assist homeowners with incomes at or below 100% of area median income. 15 U.S.C. § 9058d(c)(2). States must "prioritize remaining funds to socially disadvantaged individuals," but the Act does not define who qualifies as "socially disadvantaged." FAC, R.35, PageID 312, ¶ 45.

Treasury later issued non-binding guidance suggesting that states define "socially disadvantaged" to include members of groups "subjected to racial or ethnic prejudice or cultural bias within American society." FAC, R.35, PageID 312-13, ¶ 48. But that guidance was not mandatory. FAC, R.35, PageID 313, ¶ 50. Indeed, States like Texas and California disregarded it and adopted race-neutral definitions. FAC, R.35, PageID 345, ¶ 206-07. THDA did not, choosing to discriminate on the basis of race.

**2. THDA chooses to administer Tennessee's Homeowner Assistance Fund program on the basis of race.**

THDA was responsible for administering the State's HAF program. The agency requested and received approximately $168 million in federal funds, FAC, R.35, PageID 313, ¶ 52, which THDA accepted under assurances that it would "comply with Title VI of [the] Civil Rights Act of 1964," App'x AP_00051. Among the provisions of Title VI to which Tennessee consented was § 2000d-7, which eliminates sovereign immunity from Title VI suits. § 2000d-7(a)(1).

Nonetheless, THDA chose to expressly define "social disadvantage" based on identification as "a minority race or ethnicity." FAC, R.35, PageID 316, ¶ 62. Under THDA's scheme, an applicant was deemed socially disadvantaged if: (1) the applicant identified as a member of a minority race or ethnicity; (2) the applicant accessed language assistance due to limited English proficiency; (3) the applicant lived in a majority-minority or high-poverty census tract; or (4) the applicant resided in a county deemed to have "persistent poverty." FAC, R.35, PageID 316-17, ¶¶ 62-63. Race and ethnicity served as the primary and dispositive criterion, with the remaining factors available only if race could not be determined. FAC, R.35, PageID 316-17, ¶ 63-65.

THDA's race-based definition of socially disadvantaged individuals infected every aspect of its program. In designing the program, THDA set formal performance goals framed in racial terms, including "[t]argeting

vulnerable populations-minority households" and the "[p]ercent of applicants and recipients of each racial and ethnic group," and monitored those metrics closely. FAC, R.35, PageID 322, ¶¶ 83–84. To achieve those goals, THDA executed a targeted outreach and marketing strategy to tee up applications from minority homeowners at the expense of white homeowners. The agency divided Tennessee counties into "targeting tiers" based on the percentage of socially disadvantaged individuals in the counties, channeled communications through minority-focused media outlets and community groups representing "socially disadvantaged populations," and instructed mortgage servicers to contact minority homeowners directly. FAC, R.35, PageID 318-19, ¶¶ 68–72.

THDA also assisted minority applicants with the application process. FAC ¶ 81. This targeted approach ensured that more minority homeowners would submit applications, while white homeowners (no matter how financially desperate or otherwise eligible) were left uninformed about the program. Finally, in the application process, THDA required all applicants to identify their race and ethnicity on their applications and used that information to prioritize applications from minority homeowners over white homeowners. FAC, R.35, PageID 319-22, ¶¶ 72, 74, 80, 82.

THDA's race-based efforts were successful: Although only 10.5% of Tennessee's homeowners are black and 86.4% white, *see* App'x AP_00007, 49% of the homeowners approved for assistance were black and 49% were white, FAC, R.35, PageID 323, ¶ 87. THDA touted these outcomes in annual reports

7

to Treasury, noting that over half of its fund recipients "meet the definition of 'socially disadvantaged.'" FAC, R.35, PageID 322, ¶ 85.

When THDA narrowed the program in August 2023—restricting new applications to partial claim reimbursement for government-backed loans—the racial disparity deepened. The share of approved applications going to white homeowners fell, and the share going to black homeowners rose. FAC, R.35, PageID 315, ¶ 57. THDA's own documents had anticipated this outcome, acknowledging that a "higher percentage of both black and Hispanic/Latino borrowers receive FHA-, VA- or USDA-insured home mortgage loans than white borrowers." *Id.* (citation omitted).

## B. Procedural History.

Appellants are white Tennessee homeowners who lost income during the pandemic, fell behind on their mortgages, and either were denied HAF assistance or never learned of the program because of THDA's racially targeted outreach. All suffered from THDA's racial discrimination.

In March 2025, Appellants filed the operative class action complaint, which asserts claims under Title VI and the Equal Protection Clause. *See* FAC, R.35. THDA (along with the other defendants, THDA's board and senior officials sued in their official capacities) moved to dismiss, asserting sovereign immunity. *See* R.41. According to THDA, sovereign immunity rooted in common law is distinct from Eleventh Amendment immunity, and

Congress never abrogated sovereign immunity, allowing States to engage in racial discrimination against its own citizens with impunity.

The district court agreed with THDA. *See* Op., R.62. The court reached this conclusion "despite *Alexander*'s holding that § 2000d-7 abrogates sovereign immunity." Op., R.62, PageID 17. The district court also held that Tennessee had not waived its sovereign immunity by accepting HAF funds, reasoning that § 2000d-7's reference to "Eleventh Amendment" immunity was susceptible to a "plausible interpretation" that preserved sovereign immunity. Op., R.62, PageID 10–12. Finally, the district court held that *Ex parte Young* did not authorize prospective relief against the individually named state officers. Op., R.62, PageID 13–16. The court dismissed the complaint in its entirety without holding oral argument. Op., R.62, PageID 19. Appellants timely appealed.

## SUMMARY OF THE ARGUMENT

**I.** As the Supreme Court has held, Congress "expressly abrogated States' sovereign immunity" in Title VI cases. *Alexander*, 532 U.S. at 280**.** The district court was not free to make new law "despite" Supreme Court precedent. The district court's decision, moreover, renders Congress's abrogation a virtual nullity, enabling states to engage in racial discrimination against their own citizens with impunity.

**II.** THDA also waived any sovereign immunity it might otherwise have by accepting $168 million in HAF funds. THDA applied for and received federal funds pursuant to assurances that it would comply with Title VI, including § 2000d-7. And this Court expressly held in *Nihiser v. Ohio E.P.A.*, 269 F.3d 626 (6th Cir. 2001), § 2000d-7 operates as a valid and unambiguous waiver of sovereign immunity.

**III.** THDA is not entitled to sovereign immunity because it is not an arm of the State. Under *Galette v. New Jersey Transit Corporation*, 146 S. Ct. 854 (2026), courts make that determination chiefly by assessing if (1) the State structured the entity as a legally separate entity; and (2) the State is formally liable for the entity's debts and liabilities. Both factors confirm that THDA is not an arm of the State here. Tennessee created THDA as an independent corporate entity, and Tennessee law expressly disclaims any State liability for THDA's obligations. THDA failed to demonstrate that it was entitled to sovereign immunity under this test.

**IV.** The *Ex parte Young* doctrine independently preserves Appellants' claims for prospective injunctive relief against the individually named state-official defendants. THDA's individual officers continue to administer and market the program, and Appellants request an injunction halting that on-going conduct, which is a classic request for prospective relief. The district court erred in treating all relief as retrospective based on the closure of one part of the program. Relief designed to remedy the continuing effects of past discrimination is prospective under *Milliken v. Bradley*, 433 U.S. 267, 290 (1977).

## STANDARD OF REVIEW

This Court reviews de novo a district court's dismissal for lack of subject matter jurisdiction. *Muniz-Muniz v. U.S. Border Patrol*, 741 F.3d 668, 671 (6th Cir. 2013).

## ARGUMENT

The district court erred in disregarding decades of Supreme Court precedent. This Court should reverse.

## I. Congress Abrogated THDA's Sovereign Immunity From Title VI Claims.

**A.** In abrogating sovereign immunity, Congress used unambiguous language: "A State shall not be immune under the Eleventh Amendment . . . from a suit in Federal court in violation of . . . [T]itle VI of the Civil Rights Act of 1964." 42 U.S.C. § 2000d-7(a)(1). The Supreme Court has held that Congress "expressly abrogated States' sovereign immunity against suits

brought in federal court to enforce Title VI." *Alexander*, 532 U.S. at 280. Lower federal courts have held the same. *See, e.g., Lesage v. State of Texas*, 158 F.3d 213, 217 (5th Cir. 1998) ("[T]he original enactment of Title VI, as well as the subsequent explicit abrogation of state sovereign immunity to permit federal enforcement of Title VI, were within the congressional power to enforce the Fourteenth Amendment."), *decision rev'd in part on other grounds sub nom. Texas v. Lesage*, 528 U.S. 18 (1999); *see also Bryant v. New Jersey Dep't of Transp.*, 1 F. Supp. 2d 426, 435 (D.N.J. 1998) (holding "the congressional abrogation of state sovereign immunity from suits brought under Title VI is constitutional").

The district court erroneously concluded that, as used in § 2000d-7, the phrase "Eleventh Amendment" immunity covers only the States' sovereign immunity from suits brought by citizens of other states. But when Congress enacted the statute in 1986, the settled meaning of "Eleventh Amendment" immunity was clear and included states' sovereign immunity from suits brought by its own citizens. *See* Pub. L. No. 99-506, § 1003, 100 Stat. 1807 (Oct. 21, 1986) (codified at 42 U.S.C. § 2000d-7). It is "a fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary meaning at the time Congress enacted the statute." *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019) (cleaned up); *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024) ("[E]very statute's meaning is fixed at the time of enactment." (quoting *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018)).

By 1986, the Supreme Court—in a line of decisions stretching back to *Hans v. Louisiana*—had long interpreted Eleventh Amendment immunity to provide States with sovereign immunity from suits commenced by "Citizens of another State," as well as to bar "a citizen from bringing suit against his *own* State in federal court, even though the express terms of the [Eleventh] Amendment do not so provide." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 237-38 (1985) (emphasis added) (citing *Hans v. Louisiana*, 134 U.S. 1 (1890)); *see Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) (explaining that "[a]lthough by its terms the [Eleventh] Amendment applies only to suits against a State by citizens of another State, our cases have extended the Amendment's applicability to suits by citizens against their own States"); *Nihiser v. Ohio E.P.A.*, 269 F.3d 626, 627 (6th Cir. 2001) ("The U.S. Supreme Court construed this Amendment to grant a State sovereign immunity against suit brought by private citizens of *any* state." (emphasis added)); *Lesage*, 158 F.3d at 216 ("Federal jurisdiction is thus negated with respect to covered suits, including federal suits against a state brought by the citizens of that state."). As this Court recognized (in the very case relied on by the district court), "courts have often treated Eleventh Amendment immunity and sovereign immunity as interchangeable concepts." *WCI, Inc. v. Ohio Dep't of Pub. Safety*, 18 F.4th 509, 513 (6th Cir. 2021); *see also Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 413 n.7 (6th Cir. 2019) ("State sovereign immunity is sometimes called 'Eleventh Amendment' immunity" even though "this immunity emanates from our overall

13

constitutional framework rather than existing in any one amendment" (citation omitted)). And, as Justice Scalia observed, "[r]egardless of what one may think of *Hans*, it has been assumed to be the law for nearly a century," and "Congress has enacted many statutes" in reliance on that understanding. *Welch v. Tex. Dep't of Highways & Pub. Transp.*, 483 U.S. 468, 496 (1987) (Scalia, J., concurring in part and in the judgment).

The context in which Congress adopted § 2000d-7 further confirms that the statute abrogates the States' sovereign immunity from Title VI claims brought by in-state plaintiffs. Section 2000d-7 "was enacted in response to" its decision in *Atascadero State Hospital v. Scanlon*, in which the Court had "held that Congress had not unmistakably expressed its intent to abrogate the States' Eleventh Amendment immunity in the Rehabilitation Act." *Lane v. Pena*, 518 U.S. 187, 198 (1996); *see Nihiser*, 269 F.3d at 628 (similar). In *Atascadero*, a California citizen sought "retroactive monetary relief" from a California state agency for violations of the Rehabilitation Act. 473 U.S. at 235-36. At the time, the Rehabilitation Act did not include the abrogation of sovereign immunity now found in § 2000d-7. Accordingly, the Court held the State was immune, explaining that under binding precedent, "the [Eleventh] Amendment barred a citizen from bringing a suit *against his own State* in federal court, even though the express terms of the Amendment do not so provide." *Id.* at 238 (emphasis added) (citing *Hans*, 134 U.S. 1). The Court rejected the appellants' argument that the Rehabilitation Act abrogated or

14

waived immunity because it did "not evince an unmistakable congressional purpose" to do so. *Id.* at 247.

Dissatisfied with *Atascadero*—which addressed whether "the [Eleventh] Amendment barred a citizen from bringing a suit against his own State," *id.* at 238—Congress swiftly amended the statute. In doing so, Congress reversed the result in *Atascadero*, not only for claims under the Rehabilitation Act but also for claims arising under other statutes, including Title VI, providing: "A State shall not be immune under the Eleventh Amendment . . . for a violation of . . . [T]itle VI of the Civil Rights Act." Pub. L. No. 99-506, § 1003, 100 Stat. 1807 (1986) (codified at 42 U.S.C. § 2000d-7). Thus, there is no doubt that by enacting § 2000d-7 Congress sought to provide the sort of unequivocal abrogation that the Supreme Court's precedents demand—in direct response to a Supreme Court decision addressing a State's immunity when sued by its own citizen.

Fifteen years later, the Supreme Court confirmed this interpretation of § 2000d-7, holding that Congress abrogated "sovereign immunity" from Title VI claims brought by a State's own citizens. *See Alexander*, 532 U.S. at 280. In *Alexander*, non-English speaking Alabama plaintiffs sued the Alabama Department of Public Safety under Title VI for allegedly discriminatory conduct. 532 U.S. at 278-79. In addressing those claims, the Supreme Court explained that "§ 2000d-7 *expressly abrogated* States' sovereign immunity against suits brought in federal court to enforce Title VI." *Id.* at 280 (emphasis

added). Binding precedent thus leaves no doubt that Congress has abrogated the immunity upon which Tennessee has relied here.

The district court improperly reached the opposite conclusion, "despite" *Alexander*. Op., R.62, PageID 710. It reasoned that the distinctions drawn in *WCI*—in dictum—between Eleventh Amendment immunity and sovereign immunity meant that there was a "plausible interpretation" of § 2000d-7 that "preserve[d] sovereign immunity." *Id.* (quoting *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 388 (2023)). But *Alexander* leaves no room for such an interpretation. 532 U.S. at 280. Indeed, the district court did not cite a single case—from *any* jurisdiction—that bars a Title VI claim based on sovereign immunity notwithstanding § 2000d-7. No such case exists.

Further, *WCI* did not involve Title VI claims, racial discrimination, or Congress's abrogation of immunity in Title VI cases. 18 F.4th at 511-12. The Court in *WCI* said nothing about § 2000d-7. Instead, the Court addressed § 1983 claims brought by an Ohio strip club against a state agency that threatened to fine the club or revoke its liquor license for allowing nude dancing. *See id.* The district court held that Ohio's sovereign immunity barred the strip club's § 1983 claims and dismissed them. *See id.* at 512. This Court affirmed, *id.*,—an unremarkable outcome given that courts have repeatedly confirmed that § 1983 does not abrogate a State's sovereign immunity. *See, e.g.*, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 67 (1989)

("We cannot conclude that § 1983 was intended to disregard the well-established immunity of a State from being sued without its consent.").

The district court's reliance on other statutes for the proposition that "Congress knows how to eliminate a State's common-law immunity in addition to its Eleventh Amendment immunity" is misplaced. Op., R.62, PageID 711 (citation omitted). This reasoning relies on the negative-implication canon, but that canon is at weakest when "the two relevant provisions were not considered or enacted together." *Gomez-Perez v. Potter*, 553 U.S. 474, 486 (2008). Here, the district court compared the abrogation language in § 2000d-7 to that in the Lanham Act (15 U.S.C. § 1122), the Copyright Act of 1976 (17 U.S.C. § 511) and the Bankruptcy Code (11 U.S.C. § 106). Op. R.62, PageID 711. But Congress neither considered nor enacted any of those statutes contemporaneously with its amendments to the Rehabilitation Act, which it adopted years apart from the cited provisions.

Moreover, the district court's selective use of canons is unavailing. The court disregarded the canon that courts should not interpret statutes to render them virtual nullities. *See, e.g.*, *In re Davis*, 960 F.3d 346, 354 (6th Cir. 2020). Yet that is precisely what we have here. If Congress abrogated only the express immunity in the Constitution and not other sovereign immunity, States would be free to run rampant over civil rights. The district court would literally set back the Civil Rights movement by decades.

**B.** In any event, the district court failed to address Appellants' independent argument that § 2000d-7(a)(2) overcomes THDA's sovereign immunity,

17

even if the express abrogation language in § 2000d-7(a)(1) does not. *See generally* Op., R.62. Section 2000d-7(a)(2) provides that "[i]n a suit against a State for a violation of" Title VI, "remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State." 42 U.S.C. § 2000d-7(a)(2). Pellucidly clear, this provision establishes that THDA is liable for the same relief that any other Title VI defendant would be.

There is no way to square THDA's assertions that damages claims are barred by immunity with Congress's decision that legal and equitable "remedies" against THDA "are available . . . to the same extent as such remedies are available . . . against any public or private entity other than a State." *Id.* The absence of the magic word "immunity" is irrelevant. The statute authorizes civil-rights plaintiffs to recover money damages, and that is the basis for THDA's invocation of immunity. Supreme Court precedent "does not preclude congressional elimination of sovereign immunity in statutory text that clearly subjects States to suit for monetary damages, though without explicit reference to state sovereign immunity or the Eleventh Amendment." *Dellmuth v. Muth*, 491 U.S. 223, 233 (1989) (Scalia, J., concurring). This alone is sufficient to reverse.

## II. THDA Waived Any Sovereign Immunity From Title VI Claims by Accepting HAF Funds.

THDA also unequivocally waived its sovereign immunity from Title VI claims when it accepted HAF funds from the federal government. The Supreme Court has "long recognized" that a State "may waive at pleasure" its sovereign immunity. *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999). In order to do so, "the relevant statute" must "unequivocally express[]" a state's consent to suit. *Sossamon v. Texas*, 563 U.S. 277, 284 (2011). And waiver must be made by a "clear declaration" by the State; it cannot be implied. *Id.* (citation omitted).

Here, THDA knowingly accepted HAF funds pursuant to assurances that it would "comply with Title VI of [the] Civil Rights Act of 1964" thereby waiving its immunity from Appellants' claims. App'x AP_00051. Among the provisions of Title VI to which THDA consented when it signed those assurances was § 2000d-7's express elimination of its sovereign immunity from suit. *See Alexander*, 532 U.S. at 278-79. As this Court has explained, the "U.S. Supreme Court, as well as every circuit court to address the question, has recognized Section 2000d-7 as a valid and unambiguous waiver" of sovereign immunity. *Nihiser*, 269 F.3d at 628; *see Doe v. Nebraska*, 345 F.3d 593, 598 (8th Cir. 2003) ("Under the Rehabilitation Act, states that accept federal funds are required by statute to waive their Eleventh Amendment immunity."); *Gean v. Hattaway*, 330 F.3d 758, 775 (6th Cir. 2003) ("42 U.S.C. § 2000d-7 is an effective waiver of Tennessee's sovereign immunity from suit under

the Rehabilitation Act."); *Carten v. Kent State Univ.*, 282 F.3d 391, 398 (6th Cir. 2002) ("Ohio unambiguously waived Eleventh Amendment immunity against Rehabilitation Act claims when it agreed to accept federal funds pursuant to that Act."); *Cherry v. Univ. of Wis. Sys. Bd. of Regents*, 265 F.3d 541, 555 (7th Cir. 2001) ("In short, when the Board accepted federal education funds under Title IX, it was clearly put on notice that it may not discriminate in its programs on the basis of sex . . . ; that if it does discriminate on the basis of sex, it may be sued by a private individual . . . ; and that in any such suit,"—pursuant to § 2000d-7—"the Board may not assert its Eleventh Amendment immunity" (citations omitted)); *Litman v. George Mason Univ.*, 186 F.3d 544, 547, 557 (4th Cir. 1999) (concluding that § 2000d-7 constituted "a lawful condition of the University's voluntary acceptance of federal education funding under Title IX," and therefore, the university had "waived its Eleventh Amendment immunity").

The district court concluded otherwise, reasoning again that although "Section 2000d-7 is 'the most express language' of waiver of *Eleventh Amendment immunity*," the apparent distinction between Eleventh Amendment immunity and common-law sovereign immunity renders that waiver ineffective against Appellants' claims. Op., R.62 PageID 704. But as explained above, the meaning of "Eleventh Amendment" immunity in § 2000d-7 encompasses suits brought by a State's own citizens under Title VI. Indeed, *Tennessee itself* has repeatedly used the term "Eleventh Amendment immunity" to include a State's sovereign immunity from suits brought by its own

citizens, including in briefs filed in this Court. *See, e.g.*, Final Br. of Def./Appellant at 10 n.3, *Lane v. Tennessee*, 315 F.3d 680 (6th Cir. 2003) (No. 98-6730), 1999 WL 34845196 ("Although not expressly mentioned in the text of the Eleventh Amendment, the United States Supreme Court has long held that suits by citizens of the State being sued are also barred by the Eleventh Amendment . . . . '[The Supreme Court has] understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition which it confirms.'" (citation modified)); Defs.' Memo. in Support of Mot. to Dismiss at 4, *Amacher v. State of Tennessee*, No. 3:21-cv-638 (M.D. Tenn. Oct. 1, 2021). It is only in this case, apparently, that the State has discovered its baseless theory, which no court has ever before adopted.

### III. THDA is Not an Arm of the State Entitled to Sovereign Immunity.

Even if Tennessee were entitled to sovereign immunity, THDA is not. Sovereign immunity is "personal to the State itself" and "does not extend to lesser entities, such as municipal corporations or other governmental entities that are not arms of the State." *Galette*, 146 S. Ct. at 863, 865 (citation modified).[1] "Whether an entity is an arm of the State is a question of federal law

---

[1] The parties completed briefing on THDA's motion to dismiss on May 19, 2025. The Supreme Court decided *Galette* on March 4, 2026, just days before the district court's decision on March 16, 2026. Before the parties could brief *Galette*'s relevancy to this case, the district court granted THDA's motion to dismiss without oral argument and without addressing *Galette*.

that can be answered only after considering the provisions of state law the define the agency's character." *Id.* at 865 (citation modified).

THDA bears the burden of showing that it is an arm of the state, *Town of Smyrna v. Municipal Gas Auth. of Ga.*, 723 F.3d 640, 650 (6th Cir. 2013), but has not even attempted to shoulder that burden. *See, e.g.*, Mem. ISO Mot. to Dismiss, R.41-1, PageID 30 (conflating without reasoning THDA with the State of Tennessee); Reply ISO Mot. to Dismiss, R.48, PageID 10-11 (similar). The principal factors for determining whether an entity is an arm of the state are whether (1) the State "structured the entity as a legally separate entity" and (2) the State is "formally liable for any of [the entity's] debts or liabilities." *Galette*, 146 S. Ct. at 868-71. Both factors confirm that THDA is not entitled to sovereign immunity. *Id.* at 871-72.

*Galette* controls this case. There, the Supreme Court determined that the New Jersey Transit Corporation was not an arm of the state "entitled to share in New Jersey's . . . sovereign immunity." *Id.* at 875. NJ Transit was a "legally separate entity" because it was "created as a body corporate and politic" with "typical corporate powers, such as the power to sue and be sued," "enter into contracts," "acquire . . . real or personal property," "make and alter bylaws," and "raise funds from gifts, grants, or loans," etc. *Id.* at 871 (citation modified). That New Jersey law labeled NJ Transit an "instrumentality of the State" and that the State exerted "a substantial amount of control" over it did not alter the Court's analysis. *Id.* Moreover, the Court concluded that the State was not formally liable for NJ Transit's debts and liabilities because

22

New Jersey law provided that "no debt or liability of the corporation shall be deemed or construed to create or constitute a debt, liability, or a loan or pledge of the credit of the State." *Id.* (citation modified).

The same is true of THDA. Tennessee law created the THDA as an independent "body, politic and corporate," Tenn. Code Ann. § 13-23-104, including with the powers to "sue and be sued in its own name, plead and be impleaded," "[m]ake, enter into and enforce all contracts or agreements," "[a]cquire real property, or any interest therein, in its own name," "[a]dopt bylaws for the regulation of its affairs . . . and prescribe rules, regulations, and policies," and "make . . . loans," *id.* § 13-23-115. THDA is thus a legally separate entity from the State of Tennessee. *Galette*, 146 S. Ct. at 871. Although Tennessee law labels THDA a "political subdivision and instrumentality of the state," Tenn. Code Ann. § 13-23-104, and state officials and gubernatorial appointees exercise control over THDA, *id.* §§ 13-23-106, 13-23-107, those factors "say[ ] little about whether" THDA "is an arm of the state" and do not "meaningfully affect" THDA's "status" as "a legally separate corporation," *Galette*, 146 S. Ct. at 871-72.

Further—and most importantly—no Tennessee law makes the State formally liable for THDA's debts and liabilities. *See generally* Tenn. Code Ann. §§ 13-23-101, *et seq.* To the contrary, § 13-23-124 unambiguously disclaims any such liability, providing that THDA's "[o]bligations issued under this part shall not be deemed to constitute a debt, liability, or obligation of the state or of any other political subdivision thereof, nor a pledge of the full

23

faith and credit of the state or any other political subdivision, but shall be payable solely from the revenues or assets of the agency." *Id.* § 13-23-124(a)(1). The statute further requires that each bond or note issued by THDA bear on its face a statement "that neither the full faith and credit, nor the taxing power of the state, or of any political subdivision thereof is pledged to the payment of the principal of or the interest on such obligation." *Id.* § 13-23-124(a)(2). All THDA bonds are "general obligations of the agency, secured by the full faith and credit of the agency and payable out of any moneys, assets, or revenues of the agency." *Id.* § 13-23-120(b)(1). This statutory language tracks almost precisely the disclaimer that the Supreme Court found dispositive in *Galette*. 146 S. Ct. at 871.

Tennessee's Attorney General issued an opinion reinforcing this conclusion. That 1981 opinion explains that THDA is "technically more independent than most State agencies" and that, "in other matters, such as personnel, policy, and liability for its obligations, the Agency is independent and subject to control by its board apart from the executive branch of State government." Tenn. Op. Att'y Gen. No. 81-173, 1981 WL 142981, at *4 (Mar. 18, 1981). That THDA carries its own financial obligations, issues bonds backed only by its own faith and credit, and generates its own operating revenues from mortgage interest, fees, and investment income, *see* Tenn. Code Ann. § 13-23-122, further confirms that it—not the State—bears responsibility for its liabilities. Although the State may, in limited circumstances, advance funds to restore THDA's debt service reserve funds, those advances

24

"shall constitute and be accounted for as advances by the state to the agency" that THDA "shall [repay] to the state from all available operating revenues of the agency." *Id.* § 13-23-122(d). That limited backstop is not the same as formal state liability for THDA's obligations, and it does not transform THDA into an arm of the state.

Thus, under *Galette*, THDA is not an arm of the state entitled to sovereign immunity. This Court should reverse.

## IV. *Ex parte Young* Independently Authorizes Appellants' Claims for Prospective Injunctive Relief.

Appellants sued THDA officers in their official capacities seeking prospective relief to remedy ongoing discriminatory conduct. Although the *Ex parte Young* doctrine exempts such claims from a State's sovereign immunity, the district court nonetheless incorrectly held that Tennessee's sovereign immunity "extends to the defendants sued in their official capacities." Op., R.62, PageID 709.

Under the *Ex parte Young* exception to sovereign immunity, "a federal court may, without violating the Eleventh Amendment, issue a prospective injunction against a state officer to end a continuing violation of federal law." *Doe v. DeWine*, 910 F.3d 842, 848 (6th Cir. 2018) (citation omitted). While the exception does not apply where the request for injunctive relief is "based entirely upon past acts," if a complaint makes clear that there are "ongoing violations" of federal law that "if stopped would provide a remedy to" the plaintiff, sovereign immunity cannot bar the plaintiff's claim. *Morgan v. Bd.*

*of Prof. Resp. of the Sup. Ct. of Tenn.*, 63 F.4th 510, 515 (6th Cir. 2023) (citations omitted).

Appellants readily satisfy *Ex parte Young*'s requirements here. Appellants sued the officials responsible for administering THDA's HAF program in their official capacities. FAC, R.35, PageID 305-08 ¶¶ 17-31. The complaint alleges that those officials "continue[] to administer [the] program and process applications and payments submitted before and after August 6, 2023." FAC, R.35, PageID 315 ¶ 58. And Appellants seek prospective injunctive relief both "requiring Defendants to stop administering the program in a racially discriminatory manner," and alternatively to "reopen the program to all forms of mortgage assistance, market the program on a race-neutral basis, consider previously denied applications on a race-neutral basis, and consider new applications on a race-neutral basis." FAC, R.35, PageID 354, Prayer for Relief, ¶¶ (d)-(e). That relief would plainly remedy Appellants' injuries—including those of absent class members—both by forbidding THDA from continuing its discriminatory conduct as it processes applications, and by permitting Appellants to seek the HAF mortgage relief to which they were entitled without being subjected to THDA's racial-preferences scheme.

Despite satisfying *Ex parte Young*'s requirements, the district court incorrectly held that sovereign immunity barred Appellants' Title VI and Equal Protection Clause claims. First, the district court relied on THDA's representations that it closed the relevant mortgage assistance programs in 2023 to

reason that Appellants failed to allege ongoing violations of federal law and therefore Appellants impermissibly seek retrospective relief. Op., R.62, PageID 706-07. Second, the district court reasoned that Appellants' request for an injunction ordering Tennessee to reopen its program and reconsider previously denied applications is improper under *Ex parte Young*. The district court is wrong on both accounts.

On the first issue, the district court ignored Appellants' well-pled allegations of THDA's ongoing discriminatory conduct. To be sure, as the district court observed, THDA closed HAF applications for mortgage reinstatement and related assistance in August 2023. *See* Op., R.62, PageID 707. But, as the complaint alleges, THDA "continues to administer its [mortgage reinstatement] program and process applications and payments submitted before and after August 6, 2023." FAC, R.35, PageID 315, ¶ 58 (citation omitted). Thus, even though THDA has stopped *accepting* applications for the relevant programs, Appellants' allegations show that THDA officials continue to administer the program in a discriminatory way for those applications it has not yet processed or issued payment on. And that is more than sufficient to support Appellants' request for injunctive relief to stop administering the program in violation of Title VI and the Equal Protection Clause. With regard to these ongoing violations, the requested relief is properly considered prospective, not retrospective.

On the second issue, the district court incorrectly concluded that *Ex parte Young* does not authorize it to order THDA to reopen the program and

27

reconsider denied applications. *See* Op., R.62, PageID 707-09. But the Supreme Court has long authorized injunctions requiring officials to take steps to remedy racially discriminatory programs. *See, e.g.*, *Milliken v. Bradley*, 433 U.S. 267, 290 (1977). In *Milliken*, for example, the Court affirmed an injunction requiring state officials to implement "remedial programs" to eliminate "all vestiges of state-imposed segregation." *Id.* (citation omitted). And the Court held that such "prospective relief is not barred by the Eleventh Amendment." *Id*. The same logic applies here. The consequences of THDA's racially discriminatory conduct persists to this day. Because THDA chose to deny Appellants' applications on the basis of race, each "continues to struggle" to pay their mortgages. *See, e.g.*, FAC, R.35, PageID 324, 327, 332, ¶¶ 97, 116, 148, 171. Just as in *Milliken*, an order requiring THDA to reopen its program and reconsider applications in a racially neutral manner is necessary to "help dissipate the continuing effects" of THDA's "past misconduct." 433 U.S. at 290.

## CONCLUSION

This Court should reverse the district court's order dismissing Appellants' claims and remand for proceedings on the merits.

Dated: June 10, 2026

Respectfully submitted,

<u>*/s/ Jonathan F. Cohn*</u>
Jonathan F. Cohn
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
(512) 693-8350
jon@lkcfirm.com

William T. Thompson
LEHOTSKY KELLER COHN LLP
7500 Rialto Blvd., Suite 1-250
Austin, TX 78735
(512) 693-8350

Jared B. Magnuson
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350

Mark M. Rothrock
LEHOTSKY KELLER COHN LLP
8513 Caldbeck Drive
Raleigh, NC 27615
(512) 693-8350

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

The foregoing complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a) because it contains 6,583 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Palatino Linotype) using Microsoft Word (the same program used to calculate the word count).

*/s/ Jonathan F. Cohn*
Jonathan F. Cohn

## CERTIFICATE OF SERVICE

I certify that on June 10, 2026, the foregoing was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.

_/s/ Jonathan F. Cohn_
Jonathan F. Cohn

# DESIGNATION OF DISTRICT COURT RECORD

Appellants designate the following filings from the District Court's electronic records under Sixth Circuit Rule 30(g):

| Date Filed | R.No.; Beginning Page ID # | Description of Document |
|---|---|---|
| March 14, 2025 | R.35, PageID 300-356 | First Amended Complaint |
| April 7, 2025 | R.41, PageID 449-451 | Motion to Dismiss First Amended Complaint by All Defendants |
| May 5, 2025 | R.43, PageID 516-554 | Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss |
| May 19, 2025 | R.48, PageID 592-607 | Defendants' Reply in Support of Motion to Dismiss |
| March 16, 2026 | R.62, PageID 694-712 | Opinion and Order Granting Motion to Dismiss |
| March 16, 2026 | R.63, Page ID 713 | Judgment |
| March 16, 2026 | R.64, PageID 714-716 | Notice of Appeal |